******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

21ST CENTURY NORTH AMERICAN INSURANCE
COMPANY *v.* GLENDA PEREZ ET AL.
(AC 39060)

Prescott, Beach and Mihalakos, Js.

*Syllabus*

The plaintiff automobile insurer commenced this action for a declaratory
judgment determining whether it had validly cancelled an automobile
insurance policy that it had issued to the insured defendants, P and S,
and, thus, that it had no duty to defend or indemnify them following
S's subsequent involvement in an automobile accident that resulted in
a fatality. The defendant N, as the administrator of the estate of L,
raised several special defenses and filed a counterclaim alleging that
the cancellation notice sent by the plaintiff to P and S was fatally
defective. The trial court found that P and S had failed to send the
installment payment required for the month of June and had received
a notice of cancellation, which indicated that they could cure the default
by making both the June payment and the July payment within fifteen
days, or else their coverage would expire. The court, which found that
P and S had failed to make the full payment required by the notice prior
to the expiration of coverage, but that they had made a partial payment
in an amount slightly less than the amount of the June payment, con-
cluded that the amount stated in the notice as the amount due, which
was the equivalent of two monthly installments, was inaccurate, as the
amount actually due was the amount of the June payment only, and
that P and S had substantially complied with their obligations under
the policy by sending the partial payment. The trial court rendered
judgment in favor of the defendants on the complaint and counterclaim,
and the plaintiff appealed to this court. *Held*:

1. The trial court's finding that the amount that was actually due when the
plaintiff sent its notice of cancellation was the amount of the June
payment, and not the amount listed on the cancellation notice, was
clearly erroneous; the testimony and documentary evidence adduced
at trial indicated that the cancellation notice provided P and S with the
opportunity to cure their default for failing to timely make the June
payment by making a payment equivalent to two installments before the
cancellation date in order to remain current on their regular installment
billing schedule, and there was no evidentiary support for a contrary
finding nor any authority for the proposition that the amount specified
as necessary to resume regular installment payments cannot exceed the
initial amount of the default.

2. The trial court improperly applied the doctrine of substantial compliance
to excuse the default by P and S in light of the partial payment that
they had made following their receipt of the notice of cancellation; the
defendants provided no authority for the proposition that the doctrine
of substantial compliance or performance applies in the context of the
payment of automobile insurance premiums due on a monthly install-
ment basis, and although the substantial compliance doctrine was an
equitable rule that excused technical contractual breaches in certain
contexts, it had no application in the context of automobile insurance
payments due on a monthly installment basis and could not excuse the
failure of P and S to make full payment of the monthly installment
due under the policy under the circumstances here, where the timely
payment of the automobile insurance premiums due on a monthly install-
ment basis was an essential and material condition to coverage under
the policy and the contractual breach was material in nature, as there
could be no substantial performance where the performance owed was
the payment of money and time was of the essence.

3. This court declined to review N's unpreserved claims that the cancellation
notice violated the Connecticut Unfair Insurance Practices Act (§ 38a-
815 et seq.), the Connecticut Unfair Trade Practices Act (§ 42-110a et
seq.), and the Creditors' Collection Practices Act (§ 36a-645 et seq.), as
N failed to allege any such violations in his counterclaim and those
claims were not raised before, or decided by, the trial court.

4. The trial court improperly rendered judgment in favor of the defendants, as the plaintiff demonstrated that it had validly cancelled the automobile insurance policy it had issued to P and S: an insurer is authorized by statute (§ 38a-342) to cancel an insurance policy due to nonpayment of premium provided that, pursuant to statute (§ 38a-343), the insurer sends notice of cancellation in a certified manner, provides notice within a proscribed period of time with respect to nonpayment of the premium due, provides a statement of the reason for cancellation, and advises the insured of possible ramifications involving the Commissioner of Motor vehicles, and the record in the present case indicated that the plaintiff complied with those requirements; moreover, the plaintiff offered P and S an opportunity to avert cancellation and thereby resume regular installment payments by making a payment equivalent to two installment payments by the date of cancellation, which they failed to do.

Argued May 23—officially released November 7, 2017

*Procedural History*

Action for a declaratory judgment that, inter alia, an insurance policy issued to the named defendant et al. had been cancelled for nonpayment of premiums, brought to the Superior Court in the judicial district of Hartford, where the defendant Gregory C. Norsiegian, the administrator of the state of Leoner Negron, filed a counterclaim; thereafter, the matter was tried to the court, *Hon. Constance L. Epstein*, judge trial referee; judgment for the defendants on the complaint and for the defendant Gregory C. Norsiegian, the administrator of the estate of Leoner Negron, on the counterclaim, from which the plaintiff appealed to this court; thereafter, the court, *Hon. Constance L. Epstein*, judge trial referee, denied the plaintiff's motion for an articulation. *Reversed; judgment directed.*

*Yelena Akim*, for the appellant (plaintiff).

*Adam F. Acquarulo*, for the appellee (defendant PV Holding Corp.).

*John-Henry M. Steele*, for the appellee (defendant Gregory C. Norsiegian, Administrator [Estate of Leoner Negron]).

*Opinion*

BEACH, J. This appeal concerns the cancellation of an automobile insurance policy. The plaintiff, 21st Century North America Insurance Company, appeals from the judgment of the trial court in favor of the defendants, Glenda Perez, Ariel Seda,[1] Gregory C. Norsiegian, the administrator of the estate of Leoner Negron (administrator), Orlando Soto, Carmello Pacheco, Edgardo Contreras, Eric Valentin, John Skouloudis, and PV Holding Corporation (corporation). Because it allegedly complied with all applicable cancellation requirements contained in both the insurance policy and the General Statutes, the plaintiff claims that the court improperly failed to conclude that it validly had cancelled that policy. The plaintiff further claims that the court improperly applied the doctrine of substantial compliance to excuse nonpayment of the amount due to avert cancellation. We agree and, accordingly, reverse the judgment of the trial court.

The relevant facts are not in dispute. The insured defendants purchased an automobile liability insurance policy from the plaintiff for a term of six months (policy). They made payments on an installment basis; the payments included a monthly "installment fee" of $5. The insured defendants renewed the policy in May, 2012, and paid their first installment on May 10, 2012.

The second installment of $62.24 was due before June 11, 2012.[2] When the insured defendants failed to make any payment on that installment, the plaintiff on June 19, 2012, sent them a certified notice of cancellation (cancellation notice).[3] That notice conveyed two important messages. First, it advised the insured defendants "that your insurance will cease at and from [12:01 a.m. on July 4, 2012] due to nonpayment of premium." Second, the cancellation notice provided the insured defendants with the opportunity to avert cancellation by making payment of $124.48 prior to the cessation of coverage on July 4, 2012.[4] The plaintiff at that time also sent the insured defendants a billing invoice stating that $124.48 was due before July 4, 2012.

On June 26, 2012, the insured defendants made a partial payment of $62. In response, the plaintiff sent the insured defendants another billing invoice. That invoice acknowledged receipt of their partial payment and indicated that the remaining balance of $62.48 was "due before" July 4, 2012. The invoice advised the insured defendants in relevant part that "if we do not receive the [remaining balance] by the date shown, your policy will be terminated. . . . [T]he payment must be received by 12:01 a.m. (one minute after midnight) Standard Time on [July 4, 2012] to avoid cancellation." It is undisputed that the insured defendants made no further payment to the plaintiff prior to that date.

The "Statement of Account" admitted into evidence,

which documents activity on the policy, states that the policy was cancelled on July 4, 2012, due to "[n]on [p]ayment [e]ffective 07/04/12." On July 11, 2012, the plaintiff issued a refund of $5.01 to the insured defendants with respect to coverage that had been provided under the policy until July 4, 2012.

On July 18, 2012, the insured defendants sent an additional payment of $62 to the plaintiff. On July 25, 2012, the plaintiff returned that payment to the insured defendants because the policy already had been cancelled.

In the early morning hours of July 28, 2012, Seda was operating a 1996 Honda Accord previously covered under the policy. At approximately 2:26 a.m., Seda's vehicle collided with a 2013 Lincoln MKT near the intersection of Broad Street and Allen Place in Hartford. As a result of that collision, a passenger in the 2013 Lincoln was killed.

On May 15, 2014, the plaintiff filed the present declaratory judgment action, in which it requested a declaration that (1) the policy "had been cancelled by virtue of the non-payment of premiums as of July 4, 2012"[5] and (2) the plaintiff had no duty to indemnify or to defend the insured defendants. On August 25, 2015, the administrator filed a counterclaim alleging that the cancellation notice was "fatally defective," in that it specified an "amount due" in excess of the $62.24 installment amount that triggered that notice. The administrator also alleged, as a special defense, that the insured defendants "substantially performed all of their obligations under the policy." In answering the administrator's counterclaim, the plaintiff denied all allegations. The plaintiff, the administrator, and the corporation thereafter filed motions for summary judgment, which the court denied.

A trial was held on October 7, 2015. The plaintiff submitted a dozen documents that were admitted into evidence. Among them was a copy of the policy, which provides in relevant part that the plaintiff may cancel the policy due to nonpayment of premiums. The plaintiff also offered the testimony of Diana Yeager, the plaintiff's underwriting staff consultant, who was familiar with the plaintiff's business records and general billing practices. During her testimony, Yeager detailed how the plaintiff arrived at the $124.48 figure as the amount necessary to cure the default and avoid cancellation of the policy, noting the distinction in the plaintiff's billing practices between installment billing cycles and cancellation billing cycles.[6] Following the conclusion of Yeager's testimony, the plaintiff rested. The defendants did not offer evidence of any kind at trial.

In its subsequent memorandum of decision, the court acknowledged Yeager's explanation of the amount specified on the cancellation notice.[7] The court nevertheless found that "[t]he [$124.48] amount stated in the

[cancellation notice] was not the amount due . . . ." Rather, the court found that $62.24 "was actually due . . . ."

The court found that the insured defendants failed to make a payment of $62.24 prior to the expiration of coverage on July 4, 2012. It also found that they made a partial payment of $62 on June 26, 2012. On that basis, the court found that the insured defendants had substantially complied with their obligations under the policy, noting that "incorrect and misleading notices should not be construed to provide an insurer with absolute power that obliterates any rights of the insureds to the coverage for which they had contracted and paid. . . . [T]he ability to mislead an insured and then revoke coverage for a premium payment that is twenty-four cents less than the amount due does not comport with the fairness our law attempts to extend to all parties in such transactions." (Citations omitted.) Accordingly, the court rendered judgment "against the plaintiff and in favor of the defendants in this declaratory judgment action." From that judgment, the plaintiff appealed to this court.

I

We first address the court's determination that the installment payment of $62.24, rather than the $124.48 listed on the cancellation notice, was the amount "that was actually due" to avoid cancellation of the policy. On appeal, the plaintiff challenges the propriety of that determination. When the trial court has resolved factual disputes that underlie insurance coverage issues, those findings are reviewable on appeal subject to the clearly erroneous standard. *National Grange Mutual Ins. Co. v. Santaniello*, 290 Conn. 81, 90, 961 A.2d 387 (2009). "Such a finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [A] finding is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) Id.

It is undisputed that the installment payment due before June 11, 2012 was $62.24. It also is undisputed that the insured defendants did not make that payment. The plaintiff subsequently sent the cancellation notice to the insured defendants on June 19, 2012. In that notice, the plaintiff advised them that the policy would be cancelled in fifteen days on July 4, 2012. The cancellation notice also provided the insured defendants with the opportunity to cure their default by making payment of $124.48 prior to July 4, 2012. The corresponding billing invoice sent to the insured defendants explained that payment of that amount was necessary "in order to maintain regular installment billing." At trial, the

court heard testimony from the plaintiff's underwriting staff consultant that the $124.48 amount listed on the cancellation notice was necessary to maintain regular installment billing under the policy. In other words, the amount due reflected the $62.24 installment payment that was past due and an additional $62.24 that the insured was obligated to pay for the July installment in order to be current on premiums due pursuant to the installment billing cycle. The defendants did not present any evidence to the contrary.

The court nevertheless found that the amount "that was actually due" by July 4, 2012, to cure the insured defendants' default on their June installment was $62.24. There is no evidence in the record to substantiate that determination. Moreover, the court provided no authority, and we are aware of none, for the proposition that the amount specified as necessary to resume regular installment payments cannot exceed the initial amount of default. In response to the court's memorandum of decision, the plaintiff requested an articulation of the factual and legal bases for the court's finding as to the actual amount due to avert cancellation and its conclusion "that the cancellation premium as stated in the cancellation notice was required to mirror the regular installment premium that had not been paid." The court summarily denied that request.

Our review of the record reveals no evidentiary support for a finding that $62.24, rather than the $124.48 listed on the cancellation notice, was the amount actually due to the plaintiff to avoid cancellation of the policy. The cancellation notice, the June 15, 2012 billing invoice, the subsequent billing invoice sent on June 26, 2012, following the partial payment by the insured defendants, and Yeager's testimony at trial all indicate otherwise. The record reflects that the insured defendants did not pay $124.48 by July 4, 2012, which was the amount of premiums due by that date to remain current on the installment billing cycle. The court's finding, therefore, was clearly erroneous.

## II

The plaintiff further claims that, irrespective of whether the amount due to cure the default was $62.24 or $124.48, the undisputed evidence is that the insured defendants failed to tender such payment and that the court improperly applied the doctrine of substantial compliance to excuse their nonpayment. We agree.

"The substantial compliance rule is an equitable doctrine";[8] *In re Eagle-Picher Industries, Inc.*, 285 F.3d 522, 529 (6th Cir.), cert. denied sub nom. *Baltimore* v. *West Virginia*, 537 U.S. 880, 123 S. Ct. 90, 154 L. Ed. 2d 137 (2002); that has been applied in limited circumstances in this state. As our Supreme Court has observed, "[t]he substantial compliance doctrine has its genesis in Connecticut as a narrow exception to the

requirement that the owner of an insurance policy could change the beneficiary only by strictly complying with the terms of the policy." *Engelman* v. *Connecticut General Life Ins. Co.*, 240 Conn. 287, 295, 690 A.2d 882 (1997). In *Engelman*, the court formally affirmed the substantial compliance doctrine "as the law of this state"; id., 298; and concluded that "the owner of a life insurance policy will have effectively changed the beneficiary if the following is proven: (1) the owner clearly intended to change the beneficiary and to designate the new beneficiary; *and* (2) the owner has taken substantial affirmative action to effectuate the change in the beneficiary." (Emphasis in original.) Id. Throughout this country, numerous jurisdictions have applied the substantial compliance doctrine in that context.[9] Although the court here cited to *Engelman* in its memorandum of decision, that precedent is plainly distinguishable from the present case, as it involved neither an automobile insurance policy nor nonpayment of insurance premiums.

Our Supreme Court also has applied the substantial compliance doctrine in the context of a contractual option to purchase real estate conditioned on a lessee's compliance with a lease. *Pack 2000, Inc.* v. *Cushman*, 311 Conn. 662, 680, 89 A.3d 869 (2014). Although the present case does not arise in that context, that decision nevertheless merits attention.

In *Pack 2000, Inc.*, the court noted that "[t]he doctrine of substantial *compliance* is closely intertwined with the doctrine of substantial *performance*." (Emphasis added; internal quotation marks omitted.) Id., 675. The court explained that "[t]he doctrine of substantial performance shields contracting parties from the harsh effects of being held to the letter of their agreements. Pursuant to the doctrine of substantial performance, a *technical* breach of the terms of a contract is excused, not because compliance with the terms is objectively impossible, but because actual performance is so similar to the required performance that any breach that may have been committed is *immaterial*." (Emphasis added; internal quotation marks omitted.) Id. The court then stated that "the present case does not involve a material breach of the terms of the parties' agreements." Id., 680 n.10. Accordingly, the court concluded that "when an option is conditioned on a lessee's compliance with a lease, in the absence of explicit contractual language to the contrary, a substantial rather than strict compliance standard applies so that, if the lessee *is not in material breach* of the lease when he seeks to exercise the option and has not previously been defaulted under the terms of the lease, the option is enforceable against the lessor." (Emphasis added.) Id., 680.

Thus, the proper application of the doctrine of substantial performance requires a determination as to

whether the contractual breach is material in nature. As one commentator has observed, "[s]ubstantial performance is the antithesis of material breach; if it is determined that a breach is material, or goes to the root or essence of the contract, it follows that substantial performance has not been rendered . . . ." 15 R. Lord, Williston on Contracts (4th Ed. 2014) § 44:55, p. 271; see also 2 Restatement (Second), Contracts § 237, comment (a), p. 215 (1981) ("a material failure of performance, including defective performance as well as the absence of performance, operates as the non-occurrence of a condition"). For that reason, the doctrine of substantial performance applies only "where performance of a *nonessential* condition is lacking, so that the benefits received by a party are far greater than the injury done to him by the breach of the other party." (Emphasis added; internal quotation marks omitted.) *Officer* v. *Chase Ins. Life & Annuity Co.*, 541 F.3d 713, 718 (7th Cir. 2008).

The doctrine of substantial performance arises "in many guises"; 8 C. McCauliff, Corbin on Contracts (J. Perillo ed., Rev. Ed. 1999) § 36.5, p. 342; including "contracts for the sale of land or of goods, contracts for the rendering of personal service, and contracts for manufacture and transportation, as well as contracts for the building of buildings or for other creative construction." (Footnotes omitted.) Id., § 36.2, pp. 336–37; accord 15 R. Lord, supra, § 44:52, pp. 248–51 (doctrine of substantial performance "applies to construction contracts, service agreements, settlement agreements, and employment contracts, among others" [footnotes omitted]). The doctrine has been applied frequently by the courts of this state in the context of construction contracts. See, e.g., *Vincenzi* v. *Cerro*, 186 Conn. 612, 617, 442 A.2d 1352 (1982); *Absolute Plumbing & Heating, LLC* v. *Edelman*, 146 Conn. App. 383, 399, 77 A.3d 889, cert. denied, 310 Conn. 960, 82 A.3d 628 (2013); *Clem Martone Construction, LLC* v. *DePino*, 145 Conn. App. 316, 341, 77 A.3d 760, cert. denied, 310 Conn. 947, 80 A.3d 906 (2013); *DuBaldo Electric, LLC* v. *Montagno Construction, Inc.*, 119 Conn. App. 423, 437–39, 988 A.2d 351 (2010).

At the same time, resort to the doctrine has been expressly foreclosed in certain contexts. For example, in *Fidelity Bank* v. *Krenisky*, 72 Conn. App. 700, 715, 807 A.2d 968, cert. denied, 262 Conn. 915, 811 A.2d 1291 (2002), the defendants claimed that "by timely making their mortgage payments for nine years, they had substantially performed their obligations despite their failure to make timely payments of property taxes and to send receipts of property tax payments to the plaintiff." This court disagreed, stating in relevant part: "The defendants have failed to show . . . that the doctrine of substantial performance applies in the context of a mortgagor's obligation to make payments to a mortgagee pursuant to a note and mortgage. . . . [T]he pre-

sent case does not involve circumstances under which the traditional contract principles of strict compliance should yield. Here, the defendants failed to make tax payments as required by the terms of their note and mortgage, which resulted in foreclosure; they have suffered no prejudice and do not bear the burden of a disproportionate forfeiture by strictly enforcing the terms of their contract." (Citations omitted.) Id., 715–16. The court further noted the practical implications of the defendants' proposed reliance on the doctrine of substantial performance, noting that "to allow mortgagors to make partial payments on their mortgages, and then avoid foreclosure by way of a claim of substantial performance, would result in the unsettling of the real estate market and an increase in litigation." Id., 716. The court thus concluded "that the doctrine of substantial performance does not apply to the present situation." Id.; accord *Gibson* v. *Neu*, 867 N.E.2d 188, 195 (Ind. App. 2007) (concluding that "[t]he doctrine of substantial performance does not apply" in mortgage context where "timely payment of the debt was an essential condition of the promissory note [and] mortgage").

The defendants in the present case have furnished no authority for the proposition that the doctrine of substantial performance applies in the context of the payment of automobile insurance premiums due on a monthly installment basis. Our research likewise has uncovered no such authority. As with mortgage payments, the timely payment of insurance premiums is an essential and material condition to automobile insurance policies issued throughout this state. See *Panizzi* v. *State Farm Mutual Automobile Ins. Co.*, 386 F.2d 600, 604 (3d Cir. 1967) ("[t]he agreed exchange for the insurer's promise is the payment of the premium"). The doctrine of substantial performance has no application in such instances, as "there can be no substantial performance when the performance owed is the payment of money and time is of the essence . . . ." 15 R. Lord, supra, § 44:52, pp. 253–54. As the United States Court of Appeals for the Eleventh Circuit recently noted, "[t]here is almost always no such thing as substantial performance of payment . . . when the duty is simply the general one to pay. . . . Payment is either made in the amount and on the date due, or it is not." (Citation omitted; internal quotation marks omitted.) *Cafaro* v. *Zois*, Docket No. 16-15522, 2017 WL 2258535, *4 (11th Cir. May 23, 2017).

The policy at issue in the present case provides in relevant part that "[s]ubject to the limit of liability stated on your Declaration Page, if *you* pay the premium for Liability Coverage, *we* will pay damages for which an insured becomes legally liable . . . ." (Emphasis in original.) The policy further provides that "[w]e have no duty to provide coverage under this policy unless *you* have paid the required premium when due . . . ." (Emphasis in original.) Under the policy, then, timely

payment is an essential and material condition to the contract between the parties. Because timely payment under the policy goes to the root and essence of the contract, the doctrine of substantial performance cannot excuse an insured's failure to make full payment of the monthly installment due under the policy.

To conclude otherwise would fundamentally upend the nature of automobile insurance in this state. "If the insured could force the insurer to accept premium payments in whatever portion of the total premium that the insured felt like paying at any given time, insurers would do business in a world of financial chaos that would adversely affect both insurers and insureds: with budgeting impossible, it would be a matter of pure chance whether a given insurer has sufficient funds available to pay major losses. As a consequence, it is universally acknowledged that an insurer cannot be forced to accept less than the premium due . . . . [W]hen the insurer has agreed to installment payments . . . an insurer cannot be compelled to accept a sum less than the full installment due at a given time." 5 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2012) § 72:1, pp. 724–25. We therefore conclude that the doctrines of substantial performance and substantial compliance have no application in the context of automobile insurance payments due on a monthly installment basis.[10]

### III

In his appellate brief, the administrator attempts to raise what he characterizes as "alternative grounds" of affirmance, arguing that the cancellation notice violates the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq., the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and the Creditors' Collection Practices Act (CCPA), General Statutes § 36a-645 et seq. It is undisputed that those grounds never were raised before, or decided by, the trial court. See *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 784 n.4, 900 A.2d 18 (2006) (alternative grounds for affirmance must be raised before trial court); *New Haven* v. *Bonner*, 272 Conn. 489, 497–99, 863 A.2d 680 (2005) (declining to consider alternative ground for affirmance that was not raised before trial court). "It is fundamental that claims of error must be distinctly raised and decided in the trial court." *State* v. *Faison*, 112 Conn. App. 373, 379, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009). Our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise such claims before the trial court. Practice Book § 60-5; see Practice Book § 5-2 ("[a]ny party intending to raise any question of law which may be the subject of an appeal must . . . state the question distinctly to the judicial authority"); see also *Remillard* v. *Remillard*, 297 Conn. 345, 351, 999 A.2d 713 (2010) (raised distinctly means party must bring to attention of trial

court precise matter on which decision is being asked). As our Supreme Court has explained, "[t]he reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 761–62, 95 A.3d 1031 (2014). For that reason, Connecticut appellate courts generally "will not address issues not decided by the trial court." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998); see also *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims "neither addressed nor decided" by trial court are not properly before appellate tribunal). Moreover, we note that although the administrator filed a counterclaim in the present case, he did not raise any claim regarding CUIPA, CUTPA, or CCPA therein. We therefore decline to consider such claims in this appeal.

IV

The remaining question is whether the court improperly rendered judgment in favor of the defendants. The plaintiff maintains that it complied with every cancellation requirement set forth in both the General Statutes and the policy. As such, the plaintiff claims that the court improperly failed to conclude that it validly cancelled that policy. We agree.

At the outset, we note that "when written notice of cancellation is required, an insurer must comply strictly with policy provisions and statutory mandates." *Majernicek* v. *Hartford Casualty Ins. Co.*, 240 Conn. 86, 95, 688 A.2d 1330 (1997). Our analysis begins with the requirements contained in the General Statutes, the applicability of which presents a question of law over which our review is plenary. *Dairyland Ins. Co.* v. *Mitchell*, 320 Conn. 205, 210, 128 A.3d 931 (2016).

General Statutes § 38a-342 authorizes an insurer to cancel an insurance policy due to "[n]onpayment of premium," which is defined in relevant part as the "failure of the named insured to discharge when due any of his obligations in connection with the payment of premiums on the policy, or any installment of such premium . . . ." General Statutes § 38a-341 (3). General Statutes § 38a-343 specifically delineates the requirements of a notice of cancellation furnished to an insured.[11] It requires the insurer to (1) send the notice of cancellation in a certified manner; (2) provide fifteen days' notice with respect to nonpayment of the first premium of a new policy, and ten days' notice with respect to nonpayment of all other premiums; (3) provide a statement of the reason for cancellation; and (4) advise the insured of possible ramifications involving

the Commissioner of Motor Vehicles. See General Statutes § 38a-343 (a) and (b). The policy in the present case contains similar requirements.

The plaintiff submits, and we agree, that the record indicates that it complied with the foregoing requirements. At trial, a certificate of mailing was admitting into evidence. See footnote 3 of this opinion. That mailing was sent to the insured defendants on June 19, 2012—fifteen days prior to the July 4, 2012 cancellation date.[12] In addition, the cancellation notice stated in relevant part: "You are hereby notified . . . that your insurance will cease at and from the hour and date mentioned above due to nonpayment of premium. . . ." The cancellation notice also warned the insured defendants of possible ramifications involving the Commissioner of Motor Vehicles.[13] That undisputed evidence demonstrates that the plaintiff strictly complied with the applicable statutory and policy requirements.[14]

Under Connecticut law, an insurer is not obligated to provide an insured who has failed to pay his or her premium with an opportunity to cure that default, nor is the insurer obligated to specify the amount of the insured's payment delinquency. At the same time, "[t]o be effective, a notice of cancellation must be definite and certain." *Travelers Ins. Co.* v. *Hendrickson*, 1 Conn. App. 409, 412, 472 A.2d 356 (1984). The cancellation notice here meets that standard, as it plainly apprised the insured defendants that the policy would be cancelled due to their nonpayment of the June installment unless they tendered payment of $124.48 before July 4, 2012.

The undisputed facts of this case indicate that the insured defendants failed to make their June installment payment, which served as a proper basis for the cancellation of the policy. In addition to properly notifying them that their policy would be cancelled due to that nonpayment, the notice furnished by the plaintiff offered the insured defendants an opportunity to avert cancellation and thereby resume regular installment payments. The record demonstrates, and the defendants do not dispute, that the insured defendants did not make the payment necessary to avert cancellation by July 4, 2012. We therefore agree with the plaintiff that it validly cancelled the policy in the present case.

The judgment is reversed and the case is remanded with direction to render judgment in favor of the plaintiff on its complaint and on the counterclaim filed by the administrator.

In this opinion the other judges concurred.

[1] Glenda Perez and Ariel Seda were the insureds under the automobile insurance policy at issue in this appeal. We refer to them collectively as the insured defendants in this opinion.

[2] A copy of the May 15, 2012 billing invoice furnished to the insured defendants was admitted into evidence. It defines "Amount Due" in relevant part as "[t]he amount that must be paid in order to maintain regular installment billing. . . . If we do not receive the amount by the date shown, your

policy will be terminated. Please Note: the payment must be received by 12:01 a.m. (one minute after midnight) Standard Time on the Payment due date to avoid cancellation." That invoice further specified an "Amount Due" of $62.24.

3 In accordance with General Statutes § 38a-344, a certificate of mailing was admitted into evidence. At trial, the court took judicial notice of the Domestic Mail Manual and the certificate's compliance therewith. See *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 416 n.8, 880 A.2d 882 (2005).

4 The cancellation notice stated in relevant part: "Cancellation can be avoided if premium due is paid prior to the effective date of the cancellation. There will be no extension of coverage unless the cancellation is specifically rescinded by the company and the policy will be reinstated." The notice further indicated that the "premium amount" due was $124.48.

5 Although the plaintiff's prayer for relief avers that the policy was cancelled due to "non-payment of premiums," paragraph five of its complaint alleges in relevant part that the cancellation notice advised the insured defendants "that the [p]olicy would be cancelled unless payment of the required monthly installment payment was received on or before July 4, 2012. . . ." On appeal, the corporation contends that the foregoing amounts to a judicial admission "that a single monthly payment was due to avoid the cancellation, not twice that amount." The corporation did not advance such a claim before the trial court. Indeed, in its April 23, 2015 motion for summary judgment, the corporation averred that "[t]his is an action for declaratory judgment by the plaintiff for orders that [the policy] had been cancelled by virtue of nonpayment of *premiums* as of July 4, 2012 . . . ." (Emphasis added.) In its appellate brief, the administrator likewise states that "the plaintiff sought in its complaint a declaration that the [p]olicy had been cancelled by virtue of the nonpayment of *premiums* as of July 4, 2012 . . . ." (Emphasis added.) Moreover, we note that, in its order denying the respective motions for summary judgment filed by the parties, the court specifically indicated that "[t]here are several questions of fact that preclude the entry of any of the parties' motions for summary judgment," including those pertaining to the proper amounts due to the plaintiff. We therefore reject the corporation's contention that the plaintiff's complaint contains a judicial admission that a single monthly installment payment was due to avoid cancellation of the policy.

6 At trial, the following colloquy transpired:

"[The Plaintiff's Attorney]: [W]hat happened when [the plaintiff] did not receive a payment from [the insured defendants] on June 11, [2012]?

"[Yeager]: We have an automated billing system [that] looks at the policy and determines whether or not the policy would stay in an installment billing cycle or be switched to a cancellation billing cycle . . . . [A]t that point [the policy] was switched to a cancellation billing cycle. . . .

"[The Plaintiff's Attorney]: Can you tell us what a cancellation [billing cycle] means?

"[Yeager]: Sure. What that means is that when it switches from an installment to a cancellation billing cycle the policy is . . . no longer in that installment [cycle] and it goes into that cancellation phase to where it looks for mailing notice requirements based on the state that it's in, when the next payment is due based off of when the policy is looked at, what's not received and by the date, the amount not received and the date not received by. . . .

* * *

"[The Plaintiff's Attorney]: [Y]ou told us . . . that as soon as the policy is in cancellation mode, okay, it's gone from the installment . . . pay dates. Correct?

"[Yeager]: That's correct.

"[The Plaintiff's Attorney]: All right; so can you tell the court why the insured was [asked] to pay two times the premium in order to avoid cancellation on July 4, [2012]?

"[Yeager]: Sure. The reason—our internal system . . . is an automated system. . . . [T]he system [examines] the policy, and it determines [whether] the payment [has] been made by the due date and then also based off of the next installment payment—this is a monthly payment. It looks at also the equity in the policy to make sure that, you know, we are within . . . a twenty-one day mailing which means that . . . we send our customers this billing invoice twenty-one days prior to their next current installment. For the [insured defendants] their next current installment after they missed the June payment is July 11, [2012]. And with the notice of cancellation we

would [require] both payments because we are outside of or past that twenty-one days prior to the [July 11, 2012] installment. . . .

"[The Court]: So . . . when you send the amount that's due you include not only the last installment but the next installment.

"[Yeager]: Right. We include the past due amount that we didn't receive and then because of where the policy is at the monthly payment then [the internal system] automatically [determines whether] we need to include that next installment based off of the equity and where the policy is."

[7] The court stated: "As an explanation regarding the $124.48 listed as the amount not paid in the [cancellation notice], rather than the $62.24 that was actually due, [the plaintiff's representative] advises the court that this was an amount 'calculated internally by the plaintiff's automated premium computation system' that somehow calculates an amount the company believes would restore 'premium equity.' "

[8] Although "[i]n an action seeking a declaratory judgment, the sole function of the trial court is to ascertain the rights of the parties under existing law"; *Middlebury* v. *Steinmann*, 189 Conn. 710, 715, 458 A.2d 393 (1983); our Supreme Court has recognized that "the trial court may, in determining the rights of the parties, properly consider equitable principles in rendering its judgment." Id.

[9] See, e.g., *Metropolitan Life Ins. Co.* v. *Johnson*, 297 F.3d 558, 564 (7th Cir. 2004) ("[t]he Illinois doctrine of substantial compliance applies generally to life insurance policy beneficiary designations"); *Green* v. *Jackson National Life Ins. Co.*, 195 Fed. Appx. 398, 402 (6th Cir. 2006) ("[u]nder Ohio law, where the insured has an unconditional right to change the beneficiary of an insurance policy, a change may be effected even if the provisions of the policy setting forth the manner of effecting the change were not complied with exactly" [internal quotation marks omitted]); *Haste* v. *The Vanguard Group, Inc.*, 502 S.W.3d 611, 614 (Ky. App. 2016) ("[t]he substantial compliance doctrine has commonly been applied when the only question concerns the identity of a beneficiary under a life insurance policy"), review denied sub nom. *Haste* v. *Moore*, Docket No. 2016-SC-00380-D (2016 Ky. LEXIS 607) (Ky. December 8, 2016); *Bowers* v. *Kushnick*, 774 N.E.2d 884, 887 (Ind. 2002) ("[w]hen the terms of the [life insurance] policy have not been met, substantial compliance is an equitable doctrine employed to aid in completing an incomplete change of beneficiary in an insurance policy" [internal quotation marks omitted]); *Kentucky Central Life Ins. Co.* v. *Vollenweider*, 844 S.W.2d 460, 462 (Mo. App. 1992) ("Missouri does recognize the equitable doctrine of substantial compliance to carry out the intent of a person with authority to change beneficiaries under an insurance policy where said person has not strictly complied with the method provided by an insurance policy to change a beneficiary"); *Adams* v. *Jefferson-Pilot Life Ins. Co.*, 148 N.C. App. 356, 360, 558 S.E.2d 504 (substantial compliance doctrine "has evolved over time to address situations such as the present one, in which an insured completes a change of beneficiary form, only to die before recordation and filing of the document is completed"), review denied, 356 N.C. 159, 568 S.E.2d 186 (2002); *Empire General Life Ins. Co.* v. *Silverman*, 379 N.W.2d 853, 856 (Wisc. App. 1985) ("[t]he substantial compliance doctrine, followed in the majority of jurisdictions, states that when an insured has substantially complied with policy requirements for a beneficiary change by doing all in his or her power to conform to policy formalities, but dies before completion, the change will be deemed effective"), modified on other grounds, 135 Wis. 2d 143, 399 N.W.2d 910 (1987).

[10] We do not imply that the insured defendants' payment obligation would have been satisfied even if the doctrines did apply.

[11] General Statutes § 38a-343 (a) provides in relevant part: "No notice of cancellation of a policy to which section 38a-342 applies shall be effective unless sent, by registered or certified mail or by mail evidenced by a certificate of mailing, or delivered by the insurer to the named insured, and any third party designated pursuant to section 38a-323a, at least forty-five days before the effective date of cancellation, except that (1) where cancellation is for nonpayment of the first premium on a new policy, at least fifteen days' notice of cancellation accompanied by the reason for cancellation shall be given, and (2) where cancellation is for nonpayment of any other premium, at least ten days' notice of cancellation accompanied by the reason for cancellation shall be given. . . . The notice of cancellation shall state or be accompanied by a statement specifying the reason for such cancellation. . . ."

Section 38a-343 (b) provides: "Where a private passenger motor vehicle liability insurance company sends a notice of cancellation under subsection

(a) of this section to the named insured of a private passenger motor vehicle liability insurance policy, or a third party designee, such company shall provide with such notice a warning, in a form approved by the Commissioner of Motor Vehicles and the Insurance Commissioner, that informs the named insured that (1) the cancellation will be reported to the Commissioner of Motor Vehicles; (2) the named insured may be receiving one or more mail inquiries from the Commissioner of Motor Vehicles, concerning whether or not required insurance coverage is being maintained, and that the named insured must respond to these inquiries; (3) if the required insurance coverage lapses at any time, the Commissioner of Motor Vehicles may suspend the registration or registrations for the vehicle or vehicles under the policy and the number plates will be subject to confiscation and any person operating any such vehicle will be subject to legal penalties for operating a motor vehicle with a suspended registration; (4) the named insured will not be able to have the registration restored or obtain a new registration, or any other registration or renewal in the insured's name, except upon presentation to the Commissioner of Motor Vehicles of evidence of required security or coverage and the entering into of a consent agreement with the commissioner in accordance with the provisions of section 14-12g.''

[12] Because the cancellation notice did not pertain to the first premium of a new policy, the plaintiff was required to provide ten days' notice of cancellation to the insured defendants pursuant to § 38a-343.

[13] The notice stated in relevant part: ''WARNING—Enforcement of Mandatory Insurance Requirements for Private Passenger Motor Vehicles: This cancellation will be reported to the Commissioner of Motor Vehicles. If you do not immediately return your registration marker plates you may receive one or more written inquiries from the Commissioner concerning whether or not the required minimum insurance has been maintained. You must respond to these inquiries. If your insurance coverage lapses, the Commissioner may suspend the registration(s) for the vehicle(s) covered under the policy. Your registration marker plates will be subject to confiscation. If you continue to operate the vehicle after the registration has been suspended, you will be subject to penalties for operating a motor vehicle with a suspended registration. You will not be able to have the registration restored or obtain a new registration or any other registration or renewal in your name until you: (1) present evidence of the required insurance coverage to the Commissioner of Motor Vehicles; (2) enter into a consent agreement with the Commissioner of Motor Vehicles which will include payment of a civil penalty of $200; (3) pay a fee of $50 if your plates have been confiscated.''

[14] In its memorandum of decision, the court suggested that the cancellation notice misled the insured defendants. Such a determination is clearly erroneous, as there is no evidence in the record to substantiate that finding. The defendants did not present any evidence at trial and neither of the insured defendants testified.

Furthermore, at no time since the commencement of this litigation have the insured defendants maintained that they were misled by the cancellation notice provided by the plaintiff. We note that, in moving for summary judgment, the plaintiff submitted the April 15, 2013 deposition of insured defendant Perez as an exhibit thereto. In that deposition testimony, Perez made no claim that she was confused or misled by the cancellation notice provided by the plaintiff. Rather, she repeatedly stated that she understood that if she did not make payment of $124.48 by July 4, 2012, the policy would be cancelled. Perez further admitted that she did not make ''full payment'' by that date. Apart from that deposition testimony, the record before us contains no other statements by the insured defendants regarding the cancellation notice.